Case number 18-1114. State of California, I include its Governor Edmund C. Brown, Jr., Attorney General Xavier Becerra, and California Air Resources Board, et al. petitioner. Mr. Environmental Protection Agency, et al. Mr. Zaks, for state petitioner. Mr. Donahue, for PIO petitioner. Mr. Hofstetler, for respondent. And Mr. Murphy, for the intervener. Good morning. Good morning. May it please the Court, I'm David Zaks, representing the state petitioners in these matters. I wanted to call out two people with me at counsel's table. Sean Donahue, who is representing the Public Interest Organization petitioners, with whom I will be splitting the petitioner's time. I also wanted to introduce Robert Wyman, who is one of the attorneys representing the industry petitioners in these cases. The industry petitioners are wholly aligned in these cases with the state petitioners and the Public Interest Organization petitioners. Mr. Wyman has not asked for any time this morning, but I wanted to make his presence known to the Court, and he is fully prepared and available should the Court wish to ask any questions specific to the industry petitioners brief. And how are you and Mr. Donahue going to provide the issues? We haven't provided the issues, Your Honor, although there is, I can explain when we get into it, because there's one area where I think Mr. Donahue especially wants to focus, which has to do with the withdrawal of the final determination. And I'd like to reserve four minutes for rebuttal. EPA's revised final determination was blatantly unlawful and causes serious harms that can only be redressed by vacature. Based wholly on a threadbare record that had never been publicly disclosed, EPA withdrew its original 2017 final determination and put in its place the agency's formal affirmative determination that the standards for model years 2022 to 2025 are not appropriate under the Clean Air Act, based on EPA's conclusions that they are too stringent and too costly. EPA did this while ignoring thousands of pages of its own record and its prior detailed findings and analysis that rested on a careful synthesis of years of peer-reviewed science, original research conducted by the agency, contributions from the experts at the California Air Resources Board, input from every major automaker, and multiple rounds of public comment. That action defied the core, universally agreed-to function for the midterm evaluation process, that whatever may happen, EPA's determination whether to maintain or to change the emission standard would be based upon a single, rigorous, and publicly shared body of technical evidence and public comment on that record from all of the stakeholders. Those commitments were codified at Section 12H. The requirements contained in that regulation were a critical precondition for the stakeholders, including the state of California, to sign onto the agreement to extend the national program. The revised determination does not come anywhere close to satisfying EPA's commitments or the important procedural and substantive requirements that EPA adopted in Section 12H. It also has caused real harm. The revised determination... You might be going there at some point, but can you start with the question of finality? Yes, Your Honor, I'd be happy to. Starting with the first prong, I think it's indisputable that the revised final determination marks the consummation of the midterm evaluation, and EPA stated as much when it issued the determination and said that this notice concludes the midterm evaluation under Section 12H. So, I guess we can assume... Let's just assume that the denominator is just the determination part of it, and so you get past the first prong. Just assume it. Then, for purposes of the second prong, I guess my first question is, how does the legal consequence that ensues from the undoing of the determination and the institution of a new determination differ from what happens in the context of the notice of proposed rulemaking? Because we know that an NPRM, under our decisions, doesn't count as final agency action. Well, here, what is very different is that the agency has announced its policy. It's made a formal finding that the standards are not appropriate, and under the Clean Air Act and under the endangerment finding, and under Section 12H, the agency now is required to take action to put in place appropriate standards or standards it believes are appropriate. So, it necessarily now, following from the revised determination, has to take action to change the standards. Of course, it still requires... But the standards, it doesn't have to take... It doesn't necessarily have to take action to change the standards, right? It can take an action under which the existing standards remain in effect, and they are in effect. If nothing happens from now on, those standards continue to govern, as other standards do. Well, I think the agency would be in quite an awkward and untenable position if it took no action at this point. It has come out and, following this extensive review process, it's issued a formal finding that the standards that it's required to promulgate under Section 202 of the Clean Air Act, it's required to prescribe these standards, it's required to enforce them. Now it has said those standards are not appropriate under the Clean Air Act, and I think it would be untenable for the agency to just allow the standards to remain given that finding. Actually, in the notice of proposed rulemaking, they said they were inappropriate and unreasonable. Yes. So, that's EPA's position going into the rulemaking. That's their policy. And the only question is, I know there are cases out there that you cite that say when an agency reaches a determination, its follow-through in a regulatory fashion has to be consistent with its determination. The government argues, well, this is a 202A rehearing, as it were, and the agency has retained total discretion. I think the agency's actions have to comply with the law, and part of that body of law right now is Section 12H, which the agency has never repealed. The agency, in their papers, I think, are artfully suggesting that they have total discretion to do anything and to take any action, but they must be consistent with Section 12H. They can always change their mind. Agencies always have the ability to do that, but that does not, the cases are well established, that does not destroy finality in this case. I mean, what happens, for example, you could have an NPRM where the agency says, suppose there's an existing fabric of regulations on the books, and then the agency says, we're noticing a proposed rulemaking, and the reason we're noticing a proposed rulemaking is because we have serious reservations about whether continuation of the existing regulations is appropriate, and it's just some other agency. They don't have this special 12H procedure, and in connection with the announcement of the NPRM, that's the way they describe why they're issuing the NPRM, and they're asking all stakeholders to chime in to determine whether continuation is appropriate. It seems to me in that situation a lot of the same things you said are true, which is that the agency will have been on record as saying, boy, we've got some serious questions about this. We're issuing a notice of proposed rulemaking with an eye towards presumably changing these, but our cases say that in that context there's no finality. I think the agency has taken a much more definitive stance. It's issued a formal finding that is now on its books that followed an extensive, you know, procedurally detailed and highly substantive process that was set up to accomplish this by a date certain. It's announced that finding. It's much different than saying we have reservations and we're interested in stakeholder input. Of course, in the rulemaking process it will get additional information, but if it is going to change course it will have to explain itself and presumably issue a new determination saying that, look, we've looked at all this and here are all the reasons why we've changed our mind again. So I think it's very different than a notice of proposed rulemaking. Here we have what EPA characterized as an adjudicatory process that it has now completed and it's issued a formal finding. It has, I think, fundamentally changed the legal environment. Can you specify how it's changed the legal environment? The briefing on behalf of the government and the interveners actually were open to keeping the old rule and they also were somewhat candid about the not thorough character of the revised determination. We need to look further into some of these things. So what is the legal effect of the determination as distinct from the pending rulemaking? You're saying it takes off of the table, keeping the rule as it is. Yes, or the agency would have to do some work to explain a new position that it adopts. First of all, I want to say, and I will, EPA has been, I think, quite artful in their brief saying they have all options open here and that this whole process and the result really mean nothing. And I just want to say that's fundamentally at odds with the fact that while they had all of this claimed uncertainty, they nevertheless took this step, which is a legal step in the process that concluded the determination. Let me be clear on your argument. You're saying that the agency, notwithstanding its 2018 determination, in the rulemaking, can completely reverse that determination? I think it would take a lot of work. But you are saying it could do it. In other words, if it explained itself and dealt with everything that was in 2017 and the record and all that sort of thing. I could imagine, Your Honor, hypotheticals where unforeseen developments would lead the agency to change course or to alter its course. But at least in the proposed rulemaking and the documents that it has put forward, it hasn't given any hint of that. No, Your Honor. Or that it would possibly lead the 2012 standards in effect. So we don't have that yet. That's right, Your Honor. But the government's argument is legally, since it's a 202A proceeding, the agency retains discretion. And therefore, there is no final agency action. We disagree with that. Right. And I want to pin down specifically what the legal consequences are of what the agency did in the 2018 determination. Yes. So, first of all, it affects the petitioners in numerous ways. And I'll give a few examples. Many of the states have legal mandates or policy goals regarding the amount of greenhouse gas reduction that they must achieve by a certain date. So I want to pin that down. As I understand from reading some of the declarations, states are concerned about the commitments that are in their state implementation plan where in order to attain certain national air quality standards, they must reduce certain types of hazardous emissions to a certain extent by a certain date. That's number one. Number two, they're concerned that given Section 177 and the two-year lead time that must be provided, at least for the vehicle year 2022, as soon as EPA issued its 2018 determination, the states had to act. I get those two reasons. Is there something more the states had to do? Well, the states also have their own requirements. Some of them are mandated within the state, for instance, the state of California, to achieve certain greenhouse gas reductions by a certain date. And the national program standards provided a certain amount of those reductions of greenhouse gas emissions and changes to the standards that we believe are now going to come as a result of the revised determination. I'm trying to address sort of the clapper point that these weren't just voluntary actions by the states. It wasn't simply a matter of state law. Well, first of all, you mentioned the six, but I do want to take issue with the clapper point because one could see, you know, for instance, under Bennett v. Speer, the biological opinion that was issued by the Fish and Wildlife Service, it didn't require the petitioners who were water purchasers to do anything. But nevertheless, it affected in practical and legal ways by directing another agency to maintain minimum water levels. At some point in the future, those water purchasers were going to be affected. And the states are similarly situated because we have to achieve certain greenhouse gas reductions. By a certain date, we were receiving those reductions through the national program, and now we will be receiving fewer of those reductions in the future. So I think that... You don't know that. I'm sorry? That assumes that things will change, right? Because as it stands now, and correct me if this is wrong, as it stands now, notwithstanding the determination that said that the standards are no longer appropriate, and I take your point that that's what the determination says, the underlying emission standards are on the books, and they remain on the books. And it's going to take a conclusion of the ongoing rulemaking that undoes those in order for those to no longer be on the books. Now, I also take your point that things are headed in that direction, and as a practical matter, everybody has to adjust to that reality. I take that point, but that's also true in an NPRM context. You can have that kind of practical prediction that something's going to happen, and we're talking about percentage likelihood. But I'm just saying, is it not true that the emission standards that were announced in 2012 are on the books, and they will remain on the books unless and until the ongoing rulemaking results in a final rulemaking that undoes them? To your specific question, yes. But let me explain why this is different than the NPRM context. So everybody in 2012, EPA brought everybody to the table and said, we're going to have this review process. We're going to set this up. We want you all to join in. There shall be no fighting about the standards that we're going to establish. And everybody signed on to that, and they signed on to this midterm evaluation process, which was a critical component for the automakers to have this guaranteed review that would be put in place with a determination by a certain date. And EPA also made sure that that process would follow certain requirements, and that was very important to, I believe, all of the stakeholders, that EPA follow this rigorous, technically-founded, transparent process. And the whole goal of that was to create a record and a determination that were consistent and that would point EPA into a particular direction. But not only that, once the determination was issued, which I think is what makes this fundamentally different from, say, the NPRM context, EPA now, just like the Bureau of Reclamation was in some way compelled by the biological opinion to maintain minimal water levels, EPA has now bound itself to a certain course that, sure, if it changes mind, but that doesn't destroy finality. If it wants to change course, it's going to have to withdraw this existing determination or issue some sort of new determination. So is it, in terms of the relief that you're seeking from this court, it's limited to reviewing the determination itself. So in your view, the legal difference between the determination being in place, the revised determination being in place, and the revised determination being reviewed and potentially invalidated, assume merits you win and it's invalidated, as we must for looking at the press release. With the revised determination in place, the agency is bound to reduce the stringency of the standards by the terms of the determination. They must be either more or less stringent as appropriate. Here, less given the determination. The existing rules have been determined to be not appropriate. And so your view is if you prevail on this petition that, you know, I mean it's a limited victory because they're still going forward, they still have rulemaking authority to go forward, but among the array of options is a non-arbitrary choice to stick with the existing standards. That's exactly right, Your Honor. Your Honor, we think a decision here, a favorable decision from this court, would give the agency the opportunity to correct course. And we're not saying what that might mean, but it would have to, it would have the action that it would take regarding its standards, it would have the opportunity to ensure that that was not arbitrary and capricious and unlawful, and take into account the record that it assembled over three and a half years and that it put out for public comment and, you know, pursue a path that complies with Section 12H. And so you're right. We're not, we're asking for the court only to review the revised determination in this case for its compliance with Section 12H and whether it's otherwise arbitrary and capricious. One of the interesting questions in this case to me is do we have to look at 12H and what it requires in terms of deciding some of these threshold issues, because the way EPA wrote its 2018 determination, it sort of tried to have it both ways. In saying that it concluded that the 2012 standards were inappropriate, and now we know from the notice of proposed rulemaking, also unreasonable. But it said these are, the record as it is currently before us raises concerns that we agree should be addressed. And we're going to do that in our rulemaking. So part of your argument is, on the merits, is that's not a 12H determination. Because EPA has moved the consideration to the rulemaking, but put the cart before the horse or something like that. I get my metaphors wrong, but you get my point. But 12H says all of these decisions are supposed to be made before EPA reaches the conclusion whether the 2012 standards are inappropriate. Do you get what I'm saying? Yes, yes, absolutely. Whether there's final agency action or not. Yes. The agency says it has taken final action to the extent it has opened up this 12H proceeding, reached a conclusion in the 12H proceeding. And as 12H says, if the agency finds the current standards are inappropriate, it should proceed to a rulemaking. Yes, exactly. So we do peek at the merits in looking at these threshold issues? Well, I think this is an unusual case. It's a very unusual case. And I think that's right because when EPA, when you look at the context of this case, brought all the stakeholders together and said, this is what we are going to do, and then it later abandoned Section 12H, I think that in and of itself satisfied the second prong of Bennett because it basically deprived the petitioners, and also I'll just say the state of California, which signed on to this, of the right that the petitioners have, that EPA would fulfill in a way what it said it would do. I'm not sure about that because I guess you may have a strong argument that what was laid out in 12H wasn't complied with. And in some ways, I think their finality argument doesn't take issue with that. They're willing to stipulate to the fact that 12A was just honored in the breach. 12H, I'm sorry, was just honored in the breach. But their argument is it's still not a final determination, final agency action for purposes of jurisdiction. And on that, there's one thing you said that I just wanted to clarify and make sure I understand your argument. Were you saying that if the pending rulemaking goes through and against predictions, the pending rulemaking doesn't result in a change of the standards, that still the determination, the latest determination, the revised determination would have to be undone? I think as part of that or separately, the agency would have to issue a new determination or withdraw its existing determination. I wasn't aware of that. I thought, why couldn't the agency just explain in the final rulemaking what it's doing? I didn't realize that after the midterm evaluation period is done and the pending rulemaking is going on, that the determination still has some ongoing legal effect. Well, it does. And let me give one example, and I also want to mention Mr. Downing, who I think is prepared to address some of these questions that you're raising about the ongoing legal effect. But, for instance, the revised determination, you know, they issued the revised determination. They said the standards are not appropriate under the Clean Air Act. Had they taken no action, I think interveners or their constituent members would be on, you know, somewhat, I don't want to concede anything, but they would have a very good argument that EPA, you can't say your standards are not appropriate and then tell us we have to comply with them. And so they could bring some sort of challenge demanding that EPA take action consistent with this final determination. And similarly, if EPA ultimately, and there's no indication that they're going to do this, ultimately were to find that the existing standards remain appropriate despite their determination, I think in the course of explaining themselves they would also have to, as they did previously, withdraw the determination that they believe it was no longer appropriate. Let's just take that hypothetical and then assume it's within the field of vision, even though I take your point that you think it's realistically not. But on that, why did they have to withdraw the determination? Wouldn't they just explain that the existing standards are the right standards and we're going to institute them for all kinds of reasons? And then I don't understand, I didn't, I wasn't aware that there's a separate legal step that's set up and therefore we need to withdraw the revised determination. Well, I think then you would have a finding from the agency that's fundamentally inconsistent with the action the agency takes. Now maybe the action at that point, if they adequately explained themselves, maybe it would have superseded the existing determination. I'm sorry. Yeah. Why is it not just a FOX burden, you know, and Sino Motors burden that they have to, you know, I mean if it was a notice and comment rule that said those standards are not appropriate, all they would need to do to supervene that is to say, oh, actually, on further consideration, under the current notice and comment rule, we were wrong. Right. And I gather that your position is that there's something stickier about this set of regulations and this one-time, very robust midterm evaluation and the determination flowing from it. It somehow is different, and I think that's what we're having trouble appreciating. Well, first of all. Why? Is that if the agency has, you know, the authority to make rules, including rules that are very different from its prior rules. Well, first of all, I do think it does create a consequence as a result of the burden under FOX TV because the agency has reversed its policy. And in effect, I think what the agency is trying to do is to put a wall between the agency, the three-and-a-half years of work they did in all their findings and analysis, and the steps they want to take. So if the agency, for instance, had just left the original final determination in place, it would have to meet, I think, a higher burden under FOX TV to explain, if it wanted to change the standards, why it was, you know, it would have to confront and grapple with all of the work that it had done. But I'm hoping it's still because, in fact, I mean, I know you've characterized this differently, but in fact the government didn't say it was setting aside the TAR and the whole record. They said they were acting on it and then some. Well, Your Honor, first of all, the record from the midterm evaluation is not in the docket for the rulemaking currently. And, you know, the docket, it is what it is, and they're working on their final rule. That record is not in there at all. Secondly, I think what EPA said was, well, you know, petitioners, you can comment and you can bring these materials as if they were, you know, materials in a library somewhere to our attention. These were the agency's own analysis and findings nearly 18 months ago, detailed findings that were based on extensive technical record. And I think we submitted a Rule 28J letter showing what one of the other coauthors of the technical assessment report, how it has treated those findings and analysis. And it basically said, well, we don't have to consider those in the separate rulemaking dealing with the CAFE penalty. We don't have to consider those because EPA has issued this revised final determination. The other thing I want to stress here is we also think the agency has a chance to still act in a lawful manner and do something that's not arbitrary and capricious. And we think relief here would cause the agency to modify its course somehow. We're not predetermining how that might happen, but we'll get to a better regulatory result because the agency will have to do what it has not done at all and confront its own analysis. All right, why don't we hear from counsel, Mr. Donahue. Thank you. May it please the Court, Sean Donahue for the Public Interest Organization. Petitioners, I'd like to reserve two minutes for rebuttal. So we submit that the withdrawal of the 2017 final determination was clearly final. The 2018 revised determination states, even in the caption, and then three times within, we are withdrawing that 2017 determination. So it's not as if they say we want to add to it. It remains our findings, but maybe we'll make some other findings. Formally withdrawn. EPA's briefing, however, totally avoids that. The word withdrawal, although repeated in the notice and the legal effect of the notice, one of the two big things the notice does, it withdraws this massive determination and findings, and then it replaces it. But it's unmentioned at any point in any of their briefing or motions in the case. And that's not surprising because they have no good answer for how the original determination could be final and have legal consequences, but its rescission in 2018 not have legal consequences for purposes of Bennett Prong 2. It also explains... To be fair, they do have an answer, which is if there's no change, that's the end of that midterm evaluation. If there's a change, they're saying it just opens a process that ends with the completion of the rulemaking. Well, I mean, what they purport to have done is removed as agency policy the determination and everything supporting it, and that's, you know, why they're fighting this. Because if this was a two... If they wanted to assert their sort of independent authority under Section 202 to do rulemaking, say they said the last administration did this determination, we want to do something different. They could have done that. It would have raised a serious question why they're ignoring this process that was set up for the very purpose of making these and pollution control technology, but they could have tried. But if they'd done that, they would have had to confront the heightened burden under Fox Television and many other cases to explain departures where the prior agency policy was based on detailed factual findings. That's what this is about at its core. But don't they have to because that is still the rule on the book, determination or not. There is a 2012 rule with a preamble, and they have to explain changes from that. What they're trying to do is erase the update, which everybody agreed was critical, given the rapidly evolving technology and all that, that occurred in 2017. They want to just compare their rollback to 2012, and they're withdrawing this massive factual inquiry. And we think that is clearly final. And what do you think happens in the ongoing rulemaking process if the constituents who are unsatisfied with where the NPRM exists brings into play the 2012 underbrush and then also brings into play the determination that's now been revised? And then you have all that information before you. And that was information that is in your arsenal. Right. I'm sorry. Well, I think you know where I'm going. Why isn't that enough? We could cite, we could bring in the entire revised determination and submit it, and that's sort of what Learned Accounts on the other side says. You can always make this an appendix to your rulemaking comments. And my response is that's a very different thing, as Mr. Zaf noted, from the agency having to explain its own. And the court has said this. Like, you can deny a rulemaking petition. I've been reminded of the radio and television broadcaster's case from some time ago when the agency commits itself. And this was a major commitment. The FOX obligation here, this was very unusual. This was one of the biggest, the midterm evaluation was one of the biggest sort of undertakings EPA as an agency has made in a long time. It was four years. It was original research. It was reviewing hundreds of peer-reviewed studies. There was a National Academies of Science report that EPA analyzed and ultimately agreed with and incorporated in its findings. So that burden to explain why are you changing your position is what's at stake here. That's what they're trying to learn at counsel. You know, I think there's lots of ways in which one needs to look at what they actually said in the final determination. I think my friend on the other side has made this look into almost a creditable, we're curious about potential changes in the world and there's always uncertainties and an agency can always do better at resolving those. But that's really not what this is about. If that had been what it was about, you'd see something very different than a blanket withdrawal. And we think that withdrawal is the clearest and easiest identifiable, you know, legal consequence. Because if that has been effectively withdrawn, the legal standard going forward, the legal consequences that will flow from that action are very large because the agency's burden will be different and all these sort of technical findings from 2017 will have no status. And just to be clear, the legal consequence you see that ensues from the withdrawal is that now FOX operates against the underlying emission standards, which remain the same as a rule, which are still the same. And those are still there and you have to justify moving from those. But you don't, the EPA wouldn't have to justify moving from the revalidation of those with the additional information that attended the determination. The 2017 determination has been rescinded, has been withdrawn, very clear in the order. I think this is a case where precisely because my friend is so artful and expert, it's important to apply Chenery and look at what they actually said. And I think this is the one, these petitions for review are our opportunity to challenge that effort to rescind the 2017. But it's the baseline against which FOX operates, in other words. You're saying it's a different baseline when you're looking at what happened in 2017 as opposed to what happened in 2012. That's right. That's the practice. And that might sound ephemeral. In the context, I think in any context, of course, appellate courts reverse lower courts all the time because they apply the wrong legal standard, too high a burden, too little. So maybe it doesn't sound ephemeral. But in this context, it's so important because there's all this technical work that needs to be contended with that EPA, that's laid out, a fraction of it is laid out in the Joint Appendix. And I want to also emphasize that the status of the 2017 final determination that has been withdrawn will remain important no matter what happens with the rulemaking because that question of is this EPA's determination will matter if they, for example, do nothing. They would, I think, at some point face legitimate claims from those seeking weakening of the standards that say, you found these standards are too stringent. You've got to do something. And, you know, if they finalize the rule with a rollback, this question of whether the 2017 determination was validly withdrawn is absolutely critical. And, again, under 307B of the Clean Air Act, we had to challenge this within 60 days of April 13, 2018, when it was issued. So this court is the proper place to be challenging this withdrawal. And the relief we're seeking is limited to vacating the 2018 revised determination, which would have the effect because that is the notice that withdraws the 2018 determination of reviving the 2017 determination. And EPA would then face choices. It could return and reconsider the midterm evaluation, or they could try to proceed under 202. But if they did that, they would have to confront their own record. They could only proceed under 202, at least. I mean, they've said that they are complying with the midterm evaluation rule, or that they were, and that's why they sought to meet the April 2018 deadline, but they couldn't now because that deadline has passed. That's right. Unless they created, amended somehow, or re-complicated 12H. It's not unheard of for EPA to have to do something after a deadline, after getting instructions from a court. But no matter what they do, this question will be critical of whether they've validly withdrawn their 2017 determination. Can I quickly jump to something that's slightly unrelated that I think may be helpful on the NPRM comparison? First of all, most NPRM cases, the first prong of Bennett provides a very easy answer, that an NPRM is not a consummation. It's nothing like this midterm evaluation that was four years with a final determination by the agency head. I'm not sure I completely understand. I know our cases say that, but then our cases also go on to say that it doesn't meet prong two either. But even if it's a prong one, you could conceive of the NPRM as the consummation of the NPRM process. So it's not entirely clear to me it becomes a little tautological at some point, but there's still the prong two. But you're going to address prong one. In this case, I think I respectfully submit prong one should not be that difficult because it's a four-year process that leads to a final determination that, you know, EPA characterized as such. They, you know, closed the record. They've started a new proceeding, but that doesn't make the first one. I think it's conceivable that an NPRM could meet Bennett prong two if the agency, you know, said something, some ad hominem characterization of a private individual in an NPRM that caused them all kinds of grief and was, you know, problematic and caused legal consequences, but it wouldn't be final. I don't think there's anything inherent in the idea of an NPRM that it couldn't meet prong two. But that's not, you know, that's not what we have here. And because of this formal withdrawal of a detailed finding that EPA concedes was itself final, we think that, you know, it's quite different. If there are no more questions, I'll like to reserve the time that I've already burned through. Thank you. Good. Thank you. All right. Counsel for respondent. Good morning. May it please the court. My name is Eric Hostetler from the Department of Justice, and with me at counsel's table today is Mark Kataoka from EPA's Office of General Counsel and Erin Murphy representing the interveners. Your Honors, I would like to pick up on this discussion of finality and focus on that. Our position is that these petitions are premature and should be dismissed because this was not a final action and it met neither of the two Bennett prongs. And candidly, we don't think it's even a particularly close call on the Bennett analysis. You write your brief as though the agency was proceeding in 2018 in making its determination pursuant to 202A when, in fact, the 2018 determination says it's pursuing, it's addressing its pursuant to 12H. That's correct. And you have to take the agency at what it's saying it's doing. To be sure, the agency was applying its evaluation rule, section 12H. Your Honors, the point we're making fundamentally is that the plain text of the evaluation rule dictates that a decision to initiate rulemaking is not a final action. I mean, the only thing you can... It doesn't actually say that in the 2012 rule, but I get your point. But I just want to be clear, because you know as well as I do that there are numerous cases, Supreme Court, our court, other circuits, that to be final, a matter doesn't have to be the final step in reaching the ultimate goal. And so here, as you heard me say, I thought the agency was trying to have it both ways by saying we have done the 12H process and we have reached these conclusions. But it's included in its discussion these statements about we have some concerns and we want to address those in the future in our rulemaking. Right. And the point I'm trying to make, Your Honors, is that the 12H process was always intended to be structured so that a decision to initiate rulemaking would not be a final conclusion. I mean, let's look at the first benefit problem, the consummation problem. The only thing that is at issue in Rule 12H is should EPA revise emission standards for model years 22 to 2025 or not? And EPA hasn't concluded its deliberations on that issue. Right, although it has. It has determined that the extant rule is not appropriate, the 2012 rule is not appropriate for the back half of the time, and that it therefore will be revised to make it less stringent. It has made that determination. Do you disagree? I do, Your Honor, because the determination doesn't dictate what happens in the rulemaking. The question assumes that EPA is bound to reach the same result in the determination at the end of rulemaking. It's not. All of the options are on the table. EPA can retain the standards, make them more stringent, make them less stringent. The determination dictates nothing. I'm curious. I mean, you heard the discussion with your opposing counsel, who says, well, one thing that's at stake is the standard against which the new rule will be judged. And, I mean, another way of putting it is, well, why did EPA go to the trouble of going through, you know, putting itself in the traces of the 12H process and redetermining the results of an interim evaluation rather than just initiate as is its prerogative a new rulemaking? Why would the agency do that if it didn't have any effect? You're correct, Your Honor, that the agency could have just launched into a rulemaking. I think the agency did this as a matter of good government and transparency to signal to the public what its current thinking was and entertain another round of comment on it. Well, they could have done that easily in a notice in the Federal Register, and agencies do that all the time. But let me address the standard of review issue because I think this is important. The only thing EPA has... Before you go to standard review, can I just say, why is it so obvious you could have done that? Because what's the point of having 12H on the books if you can just circumvent it by doing something else? Right. Nothing in Section 12H compels, takes away EPA's rulemaking authority under Section 202. So EPA has always retained rulemaking authority to at any time propose the revision of standards, number one. But getting back to the issue of standard of review, the only thing that EPA has withdrawn here... So is your point it can just ignore its own regulation because 202A is there? The point is that the determination to initiate a rulemaking is not a final agency action. That's the point because EPA has not consummated its deliberative process... But that's not how EPA itself phrased its determination. I know interveners argue that all this is sort of an invitation to a rulemaking. That's not the way EPA phrased what it was doing in 2018 in the determination. It was the determination, but that begs the question of whether the determination has legal consequences and is final. So that's what I'm trying to say. Yes. I mean, EPA in a proposed rule often makes very categorical statements of facts and assertions, but that doesn't mean they are final. What about the withdrawal of the 2017 determination? Right. That's what I was trying to get at. The only thing that's been withdrawn is the decision not to initiate rulemaking. Now EPA has decided to initiate rulemaking. But EPA hasn't withdrawn prior technical analyses of the record. But it says it did. It withdrew the prior determination not to initiate rulemaking. That's what's been withdrawn. But let me say, it didn't say that. It said we, one, find the 2012 standards are inappropriate, and two, we're also vacating, withdrawing the 2017 determination. Right. Period. But that determination is still there. It's a matter of public record. It hasn't withdrawn any technical analyses. So in other words, this court... What did it mean when it said it withdrew the 2017 determination? It means it reached a new determination. And what is that? Previously it determined it was not going to initiate a rulemaking, and now... You don't think the agency was trying to avoid its burden? Yeah, I'm trying to address that. I've been trying to get to that point. It was not trying to remove any kind of burden. That January 2017 determination still stands as a prior final action, just as the 2012 rulemaking was a final action. Stakeholders are perfectly free, when and if there's a final rule on judicial review, to point to the 2012 rule, to point to the 2017 findings, and make the case that EPA hasn't... So you don't think that what FOX operates against changes as a result of the withdrawal of the... No, I don't think this court needs to review a non-final action in order to preserve its ability to... That's your finality argument. I'm just saying that when there's review at the end of the day of what EPA does, does the withdrawal of the 2017 determination affect the way FOX operates? No. Not at all, you don't think? No. I mean, because... So for FOX purposes, your view is... Can I just finish? Yeah. For FOX purposes, your view is the world remains exactly the same as if the 2017 determination were never withdrawn. In the sense that you're generally comparing final actions to previous final actions. So in this case, you know, the previous final action you would have would be the 2017 determination on the 2012 rule, and the court would be free to look to those and apply FOX. No, but the 2017 determination, the thing is the 2017 determination was a final action. Right. Right. And so, but then once it's withdrawn, that... But not withdrawn in a final way in the sense that EPA hasn't taken a final action yet. EPA may retain the standards in this rulemaking, in which case, presumably, all of the petitioners will be happy. There'll be nothing... No, but its whole analysis says, in part, we think that the 2017 determination understated the cost, and it talks about some other things it thought were wrong with the 2017 determination. So when it gets to the final paragraph, it says we withdrawing it. Right. But it is making a new determination, and all of those findings remain preliminary in the sense that EPA hasn't made a final decision as to whether to amend standards or not. But the way that... I'd be really curious as to your response to the petitioner's argument. The way that the midterm evaluation rule is written, it says that the determination is whether the standards are appropriate or not appropriate. And if they're not appropriate, the regulation, at least pursuant to that scheme, is that they shall be made more or less stringent. As appropriate. As appropriate, meaning if the reason that they were held to not be appropriate was that they weren't stringent enough, you're going to have to take it up. If the reason that they were held to be not appropriate is because they were too demanding, you're going to have to take it down. And I think, you know, there was a point made by environmental petitioners. This is a... It's not a tentative proposal. It's a big deal that was heavily negotiated in the rule that we're going to have one midterm evaluation. But its rigor is going to be at least as robust as the underlying rule. And so it makes sense to think the determination has fight in terms of which direction the institution might want to go. I want to address that question of what the purpose of this rule was, because I think it's been somewhat mischaracterized by friends on the other side. The purpose of the evaluation rule. Stepping back, you know, in 2012, ETA was setting standards 10 to 13 years in advance. And it understood two things. One, that its technology and cost projections might be off given that long lead time. And two, that its sister agency NHTSA hadn't begun promulgating the parallel closely related fuel economy standards for those latter model years, because its authority was limited as to how many years it could set. So EPA made a commitment to stakeholders, especially the automobile industry, which requested this, that it would take at least one look by 2018 as whether to initiate a rulemaking to consider new information. And that was the purpose of the midterm evaluation, to take that look. You say especially, and I understand your point, and that's in the record, that the auto industry wanted this midterm evaluation. But there were others who wanted to be sure that this wasn't just going to be an excuse to lower the standards. And therefore, 12H was adopted by the agency. But that's what I'm trying to get at, Your Honor. It was never intended as an impediment to the exercise of rulemaking authority. It was always intended to be a one-way off-ramp where, you know, EPA could – it would be a tripwire where someone who wanted a rulemaking might be able to compel EPA to look at new information and commence a rulemaking. It was never intended as a mechanism whereby EPA would have to, like, do a rulemaking in advance of a rulemaking. No, but I think that's why you wrote your brief the way you did, all right, to say this is just a 202A case. And there's no final rule yet, and so there's no final agency action. And interveners write their briefs the same way, as though what was negotiated as part of the 2012 rulemaking not as an impediment to a new rulemaking, but that before you cast aside decisions that were reached, and you're free to do that. No one was saying the agency couldn't do it, but you have to go through a process. If you look at the preamble to the 2012 rule, it's very clear that EPA envisioned a decision to initiate rulemaking as not being a final agency action and not reviewable. In that circumstance, it would be the final action at the end of rulemaking that would be judicially reviewable. That was always the intent from the get-go. It was never intended as a means by which, before EPA could even launch into a rulemaking, it would have to make a determination and defend it. Not what was intended, just what 12H and what it was supposed to do, because it seems to me that 12H contemplates either a determination that the standards are appropriate, the 2012 standards are appropriate, or that they're not. As a matter of ordinary English, suppose I say the following. I've now taken a look at the 2012 standards. You know what? They might be appropriate, they might not be appropriate, and therefore they're not appropriate. Does that make sense? Yes, it makes sense. That makes sense. I literally say those standards might be appropriate, they might not be appropriate, and therefore they're not appropriate. I think the point is that... If somebody just said that to you as a matter of ordinary English, what would your response be? Would you say, oh, yeah, I totally get it? Or would you say, I'm completely baffled? You told me they might be appropriate, they might not be appropriate, and therefore they're not appropriate. If you don't know they're appropriate, then it would make sense to do a rulemaking to... But then you wouldn't say, therefore they're not appropriate. You'd say, I don't know whether they're appropriate. And it just seems to me what's happening here over and over in the 11-page document is we're supposed to determine, we're going to start by saying they're not appropriate, and then we're going to end by saying they're not appropriate. And what we've done in the middle is basically say we don't know whether they're appropriate. All right. EPA did conclude they were not appropriate, but that's a snapshot in time. And you have to. It's a snapshot in time, and it's not a final determination. It just flows into a further deliberative process. But that's just... You're just asserting that it's not a final determination. I mean, if that determination is to be reviewed ever, it's now, right? I mean, when else can it be reviewed? Yeah, no. A determination to initiate rulemaking under this... But that's the notice of proposed rulemaking. That's the determination to initiate. This determination, you're correct, is not reviewable because it's not a final agency action. Yeah, absolutely. It's not like petitioners won't have their day in court to challenge any revision to emission standards. They will. It's just that that day hasn't arrived yet. But there's no legal consequence from this determination that's reviewable. And so that is not a final action. It's not reviewable. It will be moved when there's a rulemaking determination. And, indeed, subsequent administrative events have already largely rendered this determination obsolete. I mean, after this determination, there was a proposed rule which was based on an involved administrative record. We've now had thousands and thousands of comments submitted. So, already, the record is way past where EPA was when it made this determination. It's largely obsolete, and it will be moved completely when there's a final rulemaking action. When is that final rule? My understanding, Your Honor, is that it's still anticipated later this calendar year. It was submitted for interagency review last month. Yes, Your Honor. Did you have a question? I'm sorry. You're asking about the state. You're asking about the state. If I may, I did want to just make an important point. Do you want to answer the question? I'm sorry. What was the question? The state's reaction to the 2018 revised determination, given Section 177 and given their commitment in their SIFT. Right. Well, the standards haven't been revised yet, so what they are doing is anticipating a potential action that EPA may take in the future. Based on EPA signaling where it's headed. Right. In that sense, it would be no different as if EPA had just directly proposed a rule to amend the standards. That also works, too. No, because we have cases, and even Supreme Court, saying, you know, the agency has reached a conclusion. It's supposed to proceed to address the problem that's identified in the conclusion. Right, but it hasn't reached the final conclusion. But it doesn't have to be the final. It doesn't have to be the final point. That's what I'm trying to get at. I mean, the Supreme Court has said this. It's not just the lower court. The possibility that EPA might amend the standards has always been present. I mean, even in the January 2000s. No question about it. It could have done that, and indeed it had before it. It had not only petitions to reconsider the 2017 determination, but it had petitions for a rulemaking. And it chose to proceed on the former basis. In the interest of good government and transparency, it advised the public through this revised midterm evaluation that it intended to change course, yes. But that did not change the admission standards and did not have any legal consequences for any stakeholders. Can I ask just one concrete question about the way review will come about after, in the event that there's a rule that's adopted, ultimately that changes things from what 2012 instituted and what 2017 reiterated? Okay. So suppose that the pending rulemaking results in a final rule that changes the status quo. And then parties seek judicial review of that. And then part of their argument is EPA didn't explain why in the new rule it deviated from all the things that were said in 2017 as to why the 2012 rule, 2012 standards were appropriate. And then would your answer be, we don't have to actually explain that at all because the thing that happened in 2017 no longer exists? Or would your answer be, yeah, we have to explain why things changed from 2017 and here's our explanation? The latter, Your Honor. I mean, I'm assuming that they've preserved this issue in their rulemaking comments as they have to do under Section 307, but EPA would have to explain the departure. From 2017? Yes. And I did want to address redressability here because this is, I think, an important point. I think it's important to make crystal clear that regardless of, again, what EPA had done in this determination, it would have retained its Section 202 rulemaking authority. So the rulemaking that is now very far along and advanced and nearing conclusion is not dependent in any respect upon this determination. And essentially what petitioners are asking for is an advisory opinion because it would have no effect on EPA's rulemaking authority in terms of, you know, what's going on with that rulemaking. Are there further questions I could address regarding any of these issues? I think we have your position. Just one other point. I did want to call attention to that Clean Air Council case because I do think this is remarkably similar to a situation where EPA is acting on a petition for reconsideration or a petition for rulemaking and it grants the petition and initiates rulemaking. It's quite clear that there are often situations where a denial of a petition for rulemaking would occur and that would be considered reviewable because it's the end of the decision-making process. But like Clean Air Council suggests, where EPA initiates rulemaking and makes determinations that rulemaking is required, that's not final. And that's basically what we have here. Okay. Thank you. Thank you, Your Honor. So here is counsel for interveners. Good morning. Good morning, Your Honors, and may it please the Court. Erin Murphy on behalf of the interveners. The 2018 determination was not final agency action. It didn't satisfy either of the Bennett problems because it was the initiation, not the consummation, of a decision-making process. And because it didn't change rights and obligations on the ground. If I could kind of start with those in reverse order. I think that the second factor here is particularly clear-cut, and I pick up right where counsel just left off, which is with the Clean Air Council case. As this Court made clear in that case and has made clear in many cases, when an agency decides to grant a petition to reconsider a rule, that is not reviewable final agency action. The only context in which this Court will review those kinds of decisions is if the agency takes the additional step of actually changing the law on the ground, holding the rule in abeyance, staying the rule, delaying its effective date, vacating the rule. Here the agency did precisely the opposite. The 2018 determination explicitly says, as had been promised in 2012, that the existing standards remain on the book unless and until there is a new rule. Typically when an agency grants reconsideration, it doesn't also do something else like withdraw something. It just grants reconsideration. It doesn't vacate. It's not like an on-bank, as I understand it, it's not like an on-bank order from a court of appeals where then the decision is vacated while the on-bank proceeding is pending. And so here the argument that's being made on the other side is this is different because, yeah, there's a grant of reconsideration in some sense, but there's also a withdrawal of the determination. And, you know, it's a bit of an unusual fact pattern, but I don't think it changes the analysis at all. I mean, I think what it's equivalent to is if a petition for reconsideration were filed and the agency denied it and then a month or so later said, you know what, we changed our minds and we're going to grant it. Now, that denial, while it was on the books, would have been final agency action that was reviewable. But the fact that the agency then changes its mind and says, actually, we're going to grant it and we're going to have a rulemaking, I don't think that somehow then, you know, renders what otherwise would clearly be non-final, non-reviewable agency action reviewable. It's still just a decision to engage in a rulemaking. It's the initiation of a rulemaking and decision-making process. And at the conclusion of that, whoever wants to challenge the rule will be free to make whatever arguments they want to make consistent with their participation in the process about the steps along the way and if they think that the agency, you know, acted arbitrarily and capriciously in the process or in the way it made different determinations as it got to the ultimate conclusion to issue a rule. But all of that gets you, in the context of a rulemaking, those arguments get raised when you have a rule. They don't get raised along the way. Do you agree that the withdrawal of the 2017 determination in no way affects the burden that the agency has to explain its action if it decides that it wants to promulgate a final rule changing the 2012 standard? As a legal matter, the agency has the same FOX versus FCC burden no matter what has happened along the way. As a practical matter... So you agree. I just want to be clear about that. Yes. I mean, the same standard applies. But it's no burden on the petitioners to introduce the 2017 determination underlying document on which the agency relies. Well, I think that folks participating in this process would have to call to the agency's attention, hey, you've done all these other things and we think you need to explain yourself in light of them. That's my point. Well, I mean... The attorney did not take that position. So you're not exactly agreeing with the government. I actually don't... Maybe we misunderstood the government's position differently, but I don't think we have any different view here. I mean, you know, I can't tell you kind of in the abstract without seeing what the agency is going to say as an explanation and without, you know, looking at a whole record of what people brought to its attention and asked the agency to do, whether they will meet a FOX versus FCC burden. That's a baseline that the agency has to work from. I don't think that there really kind of is in the FOX sense some, you know, one and only one baseline that you operate on. What you look at is the agency's position in its rule, you know, is it a departure from past things the agency has said or done, and if it is the agency... You're finessing the question. I'm sorry? You're finessing the question. Well, I mean, I'm trying to give an answer that I think is consistent with the way this plays out in the real world, and the fact is, you know... Well, the question was, do you agree with the government's position? Well, and I'm not sure you and I agree on the government's position, which makes it a little hard for me to answer that. I get it. But what I would say is, you know, look, right now there are rules in place, there are existing standards in place on the ground. And, you know, EPA acknowledges that if it issues a rule that changes those standards, it's going to have to explain that there were standards, and it acknowledges that, and it can't, you know, pretend that there never was anything else on the books. But, you know, this notion that EPA kind of did all of this to whitewash the earlier process and eliminate the 2017 determination so that it would change its FOX burden, I mean, I think that's just radically inconsistent with what actually happened here. What happened, if you take a step back, is there's been a commitment that this midterm evaluation process was going to play out over another year and a half, during which stakeholders would be able to bring to the agency's attention studies that we had been conducting for quite some time to explain what we thought were flaws in the technical analysis that the agency had done, what we thought were deficiencies in the record. And they short-circuited that by issuing a rule, you know, more than, issuing a final determination in 2017, more than a year in advance. So they reopened that process. So you challenged that because that was final? We did have, we initially, we had a, you know, we filed a challenge to it. We didn't need to proceed with that because once the agency withdrew it, there was, you know, it had the effect of not requiring us all to go litigate about a determination that was not anymore going to be the determination that was on the books. So, you know, the notion that the 2017 determination was, you know, clearly and always wobble, I mean, it never got to the point of judicial review because... I'm sorry. Go ahead. Finish your sentence. Well, because they decided that they were going to reopen the rulemaking process. And at the end of that process, everybody's free to say they think that, you know, it was arbitrary and capricious to change the standards if the EPA changes the standards. But, you know, we didn't, once the determination was being taken off the books, we recognized that it would not be a good use of everybody's time and resources to come and litigate about whether EPA complied with its obligations substantively and procedurally in issuing a determination that was not the final law on the books anymore. The 2012 standards remain in place. But, you know, we decided let's wait for a rule. And if we have problems with the rule, we'll challenge the rule just as petitioners can challenge the rule if they have problems with the rule. But that's the right step at which to air all of the grievances with the process along the way. Can I ask one follow-up question? So with your hypo of the denial of reconsideration followed by the granted reconsideration, so let's just take that one out. So an agency denies reconsideration. And in the course of denying reconsideration, it has a bunch of explanations as to why it's denying reconsideration. New substantive stuff that wasn't in the original thing that's the subject of the motion for reconsideration. So it fortifies the record and it says here's some other stuff that explains to you why we're denying reconsideration. And then later on it grants reconsideration. Right. And after granting reconsideration, it changes the rule. Yes. And is your view that when that ultimate thing is challenged and there's a FOX claim that's made, that there's no difference in what happened here? That it's going to play out exactly the same way? Yeah, I think so. Okay. I think basically what happens is, you know, if the parties that are unhappy with the rule want to say as part of their efforts to challenge it as arbitrary and capricious, which FOX is just, you know, part of the arbitrary and capricious standard, it's not kind of its own separate distinct claim, but if they want to say part of what makes this arbitrary and capricious is that you previously said all of these things on the record and now you're saying something else, you know, the agency is going to need to respond to that and confront that if that's comments that are brought to the agency's attention during the process. And here, you know, I'm fairly confident that there, in the more than I think 100,000 comments on this, are comments that have been made to EPA that say why people think they should keep the existing standards, why people think the 2017 determination is right. There's comments that actually ask EPA to make the standards more stringent. You know, there's all sorts of comments here. Everybody has the ability to bring those things to the attention of the agency. And the right time to determine whether the agency has adequately addressed what people bring to its attention is when we see what the agency has done and what it has offered as an explanation for what it does in the final rule that it issues. Thank you. Why is it that your client has standing but TESLA doesn't? Or do you not dispute the standing of the industry actors on the other side? So, you know, we haven't challenged standing. And part of the reason we didn't, I mean, I think that there are positions here that have alleged what we consider to be adequate Article III injuries. I will say, as this litigation has played out and it's been clear now what everybody's positions are, it's very hard for me to understand how anyone has identified an injury that would actually be remedied by the remedy they seek because all of the injuries they've identified seem to require a remedy that would actually create certainty as to what the standards are going to be. And, you know, so I don't really think anybody has, you know, the remedy they've sought here is not going to do that. They're not binding the agency. As I've heard them today, what they were saying is putting back on the table the option of retaining the existing standards was what they're fighting for. And as they read the Rule 12H record, it really does say, you know, if it's not appropriate, then the agency is committing to the extent that it's within that process, committing to lowering the standards. And I think the problem with that is it's just not correct. I mean, what happened in the 12H determination is the agency determined, as 12H requires by its actual terms, that on the record before the agency at that time, it could not determine that the standards were appropriate. They were not appropriate on that record, okay? It then said, in light of that, we're going to have a rulemaking. In that rulemaking, the agency has said what its preferred position is, but it has sought comment on numerous options, one of which is keeping the existing standards. I mean, that's actually an option that they put on the table. Now, I want to be very clear. I mean, I'm not going to advocate for that. That's not what my clients think would be a reasonable approach here in light of the record. But as a legal matter, the agency has that authority to consider that option. And so I don't really see how, you know, the remedy that they're seeking would have any legal effect. It just seems to, they think, kind of make it seem more atmospherically like the agency has a different legal burden or a slightly more of an explanation needs to provide or something like that. It's not going to change any rights or obligations on the ground. And it's not going to change the fact that, which is the basis for their Article III injury allegations, that they don't still, you know, they still face uncertainty as to what the rule will be. At the same time, it's really no skin off your client's nose either. It doesn't change anything. I mean, you know, I think the problem is it kind of does create this very odd dynamic in which, basically, they're trying to, like, bring back to life something that itself never was, you know, it was final agency action and never was litigated because it didn't need to be because the agency promptly decided we're going to have a rulemaking. And so, you know, they kind of proceeded in their arguments on the assumption that everybody already decided that the 2017 determination not only was final agency action but was lawful agency action. And that determination never happened. And that's why I think, well, it was actually the agency's choice in taking it off, in announcing that it was going to reconsider. We did file a protective appeal. I mean, that's why, you know, it's not still pending because once this played out, it didn't really need to be pending anymore. But, you know, I do think it's worth kind of recognizing in the context of this that the timeline and how it played out is sort of relevant. Right. Thank you very much. All right. Counsel for Petitioner State? I'm going to raise a few points. And where I'd like to begin is there's a real fundamental inconsistency between, I think, what my esteemed colleagues on the other side are saying and actually the actions they've taken. And so Ms. Murphy just said that the withdrawal did not affect anyone's rights or obligations. And yet, when the final determination was issued in 2017, what the alliance put in their petition for reconsideration is, quote, for the auto industry, the final determination may be the single most important decision EPA has made in recent history. So if they concede that the final determination, the 2017 final determination, was a final action that had legal consequences and that's certainly consistent with that statement, then I don't see how it could be that the withdrawal of that, if the final determination created legal consequences, I don't see how the withdrawal could not also create legal consequences, especially in the context of this case. That seems like that's equally true of denial of reconsideration followed by granted reconsideration. Because what a party would say is this is a huge deal if this stays on the books. And then reconsideration's denied. It's a really huge deal. And then it's followed by a grant of reconsideration. And you could make the same argument, which is to say it's just a grant of reconsideration and it reverses something that everybody agrees was a big deal. And therefore, this must be a big deal, too. But the grant of reconsideration isn't final. But the 2017 final determination did not alter anyone's rights or obligations in any way. I mean, I think it does have legal consequences. Let me withdraw what I just said and say it a little differently. It did not change the standards. So it has legal consequences. But the idea that in order to have legal consequences, EPA's action has to have changed the standards, I think, is at odds with the intervener's position that the determination in 2017 was the most important decision EPA had taken. And the difficulty is that if you take the framework of the 2012 rule, including the midterm evaluation process, as the universe, then it's momentous what happens at the midterm evaluation. And when everybody's at the table and playing that game, you know, all the stakeholders feel like, you know, we had midterm evaluation, we had par se, and whether the rules were, you know, more demanding, less demanding. Everyone's at the table. Then it seems hugely consequential. But once they say, we are the agency and we have the ability to play a totally different game, and we're going to do that now, if they're willing to take that hit as a matter of public relations and politics, they can do that. No? They have codified their commitment in a regulation that they're bound to follow. So in setting up the new game, they have to do some new codification, and they're willing to live with that. Well, and they could have. They could have repealed or amended Section 12H, but they did not do that. They have to live within the requirements that they put into law in the regulation. And... Aren't they in effect doing that in their new rules? Amending Section 12H? That was in the NPRM. Kicking it to the curb? Well, and that's why we're here, Your Honor, because they're kicking it to the curb. And, you know, that is a... That change itself, I would say, is also something that has legal consequences for everyone, including stakeholders, including the automakers, who signed up for this regulatory regime. And this is, again, I think an unusual case, and we have to consider the entire context and understand that EPA bound itself, and it wouldn't make sense to say that EPA could then walk away from those requirements that it put in writing in the regulation and that we could never, as Mr. Hostetler said, we can't challenge it now. We can never challenge it. They committed all of these procedural violations and substantive violations, and he's saying there's just no relief. The other thing I want to mention along those lines is this was a, as you said, like a momentous effort, and an effort that I think we want agencies to be able to do, to have this kind of tool in their toolbox. But if agencies can simply abandon their existing regulations and requirements and change course, I think it's going to be hard to get, you know, a whole host of stakeholders, including, you know, one of the largest national industries, you know, several of the states, industry actors on both sides of the standards together to agree to this sort of procedure. Agencies have to be held to what they're committed to. Both Mr. Hostetler and Ms. Murphy have said, oh, we do have to live with that. That is a big elephant in the room in which we operate in the new rulemaking. They both said that. It doesn't change the, I mean, they disagree with your position. If it doesn't change the FOX burden, it doesn't affect the ability to deploy all that information in challenging, in the process of the new rulemaking, challenging the new rulemaking. Well, but then why didn't they do that in the revised determination? They asked it as if. They wanted to put people on notice early because lead time is really important. Okay, Erin, I'd like to address a couple of things there. One, they had 13 months, and they issued a total of something like 16 federal register pages. They had lots of time to do this work, and this is one of the administration's highest priorities when it comes to the environment. They could have put out additional evidence that they wanted to include in the TAR, put it out for public comment. They could have complied with Section 12H, and I submit, Your Honor, that would have been good government. The other thing, and I lost my train of thought for a second, but I'm going to hopefully I'll remember it. There are a couple of other things I wanted to mention. Mr. Hofstetler has proposed on behalf of EPA that this was always supposed to be some sort of bifurcated standard that would apply one way if there was one determination and another way if there was another. There's nothing like that in Section 12H, nor in the preamble. There is one set of requirements that applies to any determination it makes, and I just want to submit, it would make no sense to set that up because a different administration could have just said, well, we're not going to release the TAR for public comment, and we're going to embark on a rulemaking to strengthen the standards. And I submit that interveners would be up here claiming, hey, we have rights under Section 12H. You can't just do that. Moreover, the entire process was put in place to have some sort of stability for all of the actors, that they could count on that there would be this process that everybody would follow, there would be this record that would be a common record that everybody would be able to comment on and contribute to. The other issue I want to raise is, you know, that there were procedural injuries here that cannot be addressed in a subsequent case on the road. They need to be addressed now. In fact, I think all of our injuries really need to be addressed now. We submitted our petitions within the time provided for, and the idea that we should have just waited and brought these things up in a future proceeding just doesn't make sense. All right. Thank you. All right. Council, public interest organizations? I would just suggest that counsel for respondents have suggested that the withdrawal of the 2017 determination was effectively meaningless for purposes of standard of review, and I would suggest that if that's true, if that's now their position, they shouldn't object to the vacatur of the rescission in 2018. I think it would be appropriate to take the 2018 Federal Register notice at its word. I think a heavy dose of Chenery and the bark on sort of post hoc massaging of agency actions is really warranted here. The suggestion that the revised final determination was in some sense agnostic about where the standards should go, I don't even think it's necessary to view that determination as committing the agency to a particular reduction in standards, but the suggestion that that's what was going on, I would just note that the day, at the same time the revised final determination came out, the administrator of the agency on his official Twitter account said that they were taking this action because the standards were too high and needed to be rolled back. I know that reliance on Twitter is controversial and problematic and has been castigated by my learned friend for bringing in something. It is in the record of this case, but it wasn't in the administrative record. But I think there's a certain dose of realism is fair when the agency head is actually reaching out to the public and explaining the agency's actions. I think the theory spun out today that FOX will come into play in undiminished form is problematic. I mean, FOX operates on policies that are in effect. And yes, I think even the confessions that have been made today, which seem very significant, I think they don't distinguish between the agency's reversing its pending policy position and the underlying findings and simply the obligation to explain someone's comment. He said, oh, back in the past you did something else. There is a duty to respond to comments and to not be arbitrary and capricious. But as FOX and many other cases make clear, it's a very different thing when you're reversing your existing policy. And finally, I would note that when questioned about what standard would apply to the review of a final rule and whether the 2017 findings would be something the agency had to respond to with a full FOX burden, I think Mr. Hofstetler said something like it's hard to answer that in the abstract. We submit that the right thing to do here is vacate this very flawed and final action. But if there were anything to that idea, the proper action would be to hold this case in abeyance until the question is not abstracted. If there are any further questions, I will ask you to sit down. Thank you very much for your time. All right, thank you very much. We'll take the case to the department. Thank you.
judges: Rogers, Srinivasan, Pillard